VERNON ABSTRACT COMPANY v. WAGGONER TITLE COMPANY ET AL.

Decided February 6, 1908.

**1.—Copyright—Common Law.**

At common law, and independently of the copyright statutes, an author has an exclusive right of property in and to his manuscript, before he publishes it. The contents of the manuscript need not be the product of the author's own brain; it is sufficient if he has merely gathered from sources accessible to all alike, the material forming its contents and arranged the same in a concrete form.

**2.—Same—Abstract of Land Titles.**

At common law, one who compiles from public records and other sources of information, an abstract of titles to lands, is entitled to the exclusive use of such compilation and to all parts thereof, so long as he withholds it and its parts from publication. This right may be assigned or transferred to another. With the first publication, however, of such compilation or parts of the same, the owner's right to the exclusive use of the same or the parts published, ceases, and any one may thereafter make and use copies of the same.

**3.—Same—Publication—Definition.**

A manuscript or compilation is said to be "published" when the owner either sells or offers the work for sale to the public generally. When the owner of a compilation of land titles sells or offers to sell to the public generally, abstracts from such compilation, the parts so sold are published, in contemplation of law; and the fact that the sale was for the purpose of examining the title to a particular tract of land, and for no other purpose, is immaterial. Any person thereafter has the right to copy and use the same, in the absence of a statutory copyright.

**4.—Publication—Restrictions Upon Use—Invalid.**

If a book be put within the reach of the general public so that all may have access to it, no matter what limitations may be put upon the use of it by the individual purchaser, it is "published," and the common law copyright, or right of first publication, is gone.

Appeal from the District Court of Wilbarger County. Tried below before Hon. S. P. Huff.

*Berry & Lucky,* for appellants.

*R. W. Hall* and *J. Shirley Cook,* for appellees.—The author or compiler of any literary property has the exclusive right to its first publication, but when once published it is dedicated to the public, and the author has not, at common law, any exclusive right to multiply copies of it, or to control the subsequent issues of copies by others. The right of an author or proprietor of literary property to multiply copies of it to the exclusion of others, exists only when the same has been copyrighted. State of Neb. v. State Journal Co., 9 L. R. A. (N. S.), 174; Palmer v. DeWitt, 106 N. W., 434, 47 N. Y., 532, 7 Am. Rep., 480; Parton v. Prang, 3 Cliff., 537; Boucicault v. Hart, 13 Blatchf., 47; Carter v. Bailey, 64 Me., 458, 18 Am., Rep., 273; French v. Maguire, 55 How. Pr., 471; Potter v. McPherson, 21 Hun, 559; Carter v. Ford, 15 Fed. Rep., 439; Climmons v. Belford, 11 Biss. 459, 14 Fed. Rep., 728; Coppinger, Copyrights, 3d ed., 119; Ladd v. Oxsard, 75 Fed. Rep., 729; Rees v. Peltzer, 75 Ill., 475; Press Pub. Co. v. Monroe, 51 L. R. A., 353, and extended notes to this case on page 373, et seq.; Jewelers Merc. Co. v. Jewelers Weekly Pub. Co., 41 L. R. A., 846.

WILLSON, Chief Justice.—The suit was brought by appellant against the Waggoner Title Company, a copartnership composed of G. L. Waggoner and R. L. More, and against the Vernon Land Title Company, a copartnership composed of W. B. Townsend and Frank L. Massie, to restrain them from using in their business of furnishing abstracts of title to land to the public, certain compilations of data from the deed records of Wilbarger County which appellant claimed the exclusive right to use. Certain special exceptions and a general demurrer urged by appellees to the appellant's petition were by the trial court sustained, and, appellant refusing to amend, its suit was dismissed. From the judgment of dismissal appellant prosecutes this appeal.

The correctness of the trial court's action in sustaining appellee's general demurrer to the petition is questioned by appellant's first assignment of error. In the petition it is alleged that one J. J. Stephens, for the firm of Nabors & Stephens, and one R. T. Sitterly, for the firm of Elliott & Sitterly, at a time not specified, from the records of Wilbarger County compiled an abstract of the titles as shown by such records to lands in said county; that in making such abstract all the instruments of record in books "A" and "A 1" of the deed records of said county "were correctly and truly copied" and "correctly and truly placed and entered upon" the abstract book of said Nabors & Stephens and Elliott & Sitterly; that afterwards, but when does not appear, said books "A" and "A 1" were stolen from the clerk's office and had never afterwards been recovered; that with the exception of a few of the original instruments (but what

ones was not specified) afterwards re-recorded in subsequent records of said county, the abstract so made by said Stephens and Sitterly was "the only books and records that contained authentic data and record of all of said instruments and matters which had been recorded in said official deed records," designated "A" and "A 1;" that said two lost record books "contained the record of all ·original instruments affecting the title to all lots and blocks of land situated in the original town of Vernon, Texas, on S. ½ sec. 18, and the north and south additions to said town of Vernon, situated on sections 18 and 64, in block 12, H. & T. C. R. R. Co. surveys, and what is known as Oklahoma Strip in said town, and said sections 18 and 64 lying outside of the town limits of said town;" that the sundry written instruments made a part of its petition by copies thereof attached to it, materially affected the title to all the lots and blocks of land on said south ½ of sec. 18, situated and located in the original town of Vernon, and to the lots and blocks in said south ½ section 18, and south 100 acres_of the N. ½ of said section 18, situated in the north and south additions to said town; and as well the title to other portions of the N. ½ of section 18 and a part of section 64; that said instruments were not elsewhere than in said lost books "A" and "A 1" recorded in Wilbarger County; "that the copies and transcripts properly abstracted and taken from said lost records by said Stephens and Sitterly in the manner as aforesaid, were by them correctly and accurately placed and entered upon said abstract books and records, from which said exhibit sheets have been taken;" that in "making a true, correct, reliable and authentic abstract of the title to any part or parcel of the lots and blocks of land" situated in said town on said parts of sections 18 and 64, "it is necessary to place in such abstract, abstract sheets the same as those on file herewith, marked 'Exhibit A,' and no reliable and authentic abstract of the title to said lands can be made without the use of same, which would be complete in showing all valid instruments bearing upon and affecting the title to said lands;" that because said abstract of titles so made by Stephens and Sitterly contains said instruments, and because no other abstract of titles to lands in Vernon and Wilbarger County does contain same, said abstract of titles so made by Stephens and Sitterly was of the reasonable market value of $1000 above that of any other set of abstract books of titles to land in said town and county; that by purchase from said Nabors & Stephens and said Elliott & Sitterly, petitioner was the owner of said set of abstract books, and was engaged in the business of furnishing abstracts of title to lands situated in said town and county; that defendants were engaged in the same business; that the defendants did not "have complete abstract books and records of the title to the lots and blocks of land" situated on said parts of sections 18 and 64, "and complete abstract books can not be prepared and made by them, concerning the title to the aforesaid lands, on account of the loss and destruction of said records 'A' and 'A 1;'" that defendants have been preparing and furnishing "and assert that they will continue to prepare and furnish abstracts of title to the aforesaid designated property, to any and all

persons who may desire and demand from them the same, and in preparing and making up such abstracts, in order to make and show complete abstracts of the property" use therein abstract sheets the same as those made a part of its petition and marked "Exhibit A;" "that said defendants procured such abstract sheets by copying from abstracts of title containing said sheets prepared by plaintiffs from their said abstract books and records and turned out of their office to persons and individuals who have procured the same for the purpose of examining the title to certain specific property, and for no other purpose;" "that the said defendants in thus procuring said abstract sheets and using them in their business of abstracting titles are interfering with and infringing upon the rights of plaintiffs to the exclusive use of all their said abstract books contain;" "that defendants in thus copying from abstracts prepared by plaintiffs from their said books and turned out of their office to various and sundry persons in the course of their business are using said books and records, the property of plaintiff, without their consent or authority and to their great hurt and injury."

By the common law an author has a right of property in his manuscript, and before he publishes it is entitled to its exclusive use. (Wheaton v. Peters, 8 Peters (U. S.), 591, 8 Law. ed., 1055). This right of property exists and will be protected independently of and notwithstanding copyright statutes. The contents of the manuscript need not be the product of the author's own brain. If he has merely gathered from sources accessible to all alike the material forming its contents, and arranged same in a concrete form, the material as so arranged by him is his property, and he is entitled to be protected in its exclusive use in that form until such time as he sees proper to publish it. Under the rule stated, the compiler from public records and other sources of data together forming an abstract of titles to lands, is entitled to the exclusive use of such abstract, and to all parts thereof, so long as he sees proper to withhold it and its parts from publication. The property and the right to its exclusive use prior to publication can be assigned or transferred to another. (7 Am. & Eng. Enc. Law, 2d ed., 513, and notes to Press Pub. Co. v. Monroe, 51 L. R. A., 358.) The right to the exclusive use of the property exists in the author or compiler and his assignee only so long as the manuscript remains unpublished. And after its publication the owner has not, as he would have if the work were copyrighted under the statute, the exclusive right to multiply copies thereof. With its first publication his right to its exclusive use ceases, and anyone thereafterwards can make and use for his own purposes copies of the work. (Wheaton v. Peters, *supra;* Palmer v. DeWitt, 47 N. Y., 532, 7 Am. Rep., 480.)

There being no pretense in the allegations in the petition that appellant is entitled to the relief sought because it had taken the steps required by the copyright laws to secure to itself the exclusive use of its abstract and of the right to make copies thereof after its publication, the correctness of the court's action in sustaining the general demurrer is to be determined by the application of the rules stated above to the allegations in the petition. The allegations

material to the point to be considered are, that appellant was engaged in the business of furnishing abstracts of title to lands in Wilbarger County; that to make such abstracts covering certain portions of sections 18 and 64, marketable, the same must be complete; that to be complete they must contain the sheets or copies thereof from books "A" and "A 1" forming a part of their abstract; that as its abstract books alone contained such sheets it alone could make such complete abstracts of said portions of sections 18 and 64, if appellees were enjoined from using such sheets; and that if appellees were so enjoined, as a result it would receive in its business the enhanced reward and profit to be derived from the exclusive use of such abstract sheets, which, it is alleged, would amount to the sum of $2500. It is further alleged that appellees procured the abstract sheets in question "from abstracts of title containing said sheets prepared by plaintiff from their said abstract books and records turned out of their office to persons and individuals who have procured the same for the purpose of examining the title to certain specified property, and for no other purpose."

The fair, and perhaps only proper, conclusion to be drawn from these allegations is that appellant had theretofore furnished to those of the general public who desired them, abstracts of title containing the sheets in question; and had been and was then offering to furnish such abstracts to anyone who might wish and who was willing to pay its price for them. Either so furnishing such abstracts, or so offering to furnish them, we think was such a publication of the sheets in question as deprived appellant of the exclusive right thereafterwards to multiply copies thereof. It is a publication if the owner either sells or exposes the work for sale. (Jewelers' Mercantile Agency v. Jewelers' Weekly Pub. Co., 155 N. Y., 241, 41 L. R. A., 849.) And the fact that the sale, or offer to sell, was to persons who procured the abstract "for the purpose of examining the title to certain specified property, and for no other purpose," did not render it any less a publication. While there may be a distribution of a work so restricted as to persons and purpose as to prevent such distribution from operating as a publication, we think such distribution must be on some other than a commercial basis. If the limit as to persons was to friends and acquaintenances "it would not," as Coppinger in his work on Copyright declares, "be a publication;" "but, if general, and not so limited," he adds, "it would be" (p. 117).

Here, according to the allegations of the petition, there was no limit as to the number of persons appellant proposed to sell its abstracts to; nor is there in the petition any allegation showing the distribution thereof already made to have been limited to particular persons. The inference is that the distribution had been made to all who on its terms desired copies of the abstracts. This being true, the fact that the copies were procured, or were believed by appellant to have been procured, for the purpose specified and for no other purpose, would not prevent the distribution from operating as a publication. Even had the parties furnished by appellant with the abstracts contracted to use them only for the purpose specified

in the petition, such a limitation of use would not have made the delivery of the abstracts to appellants therefore less effective as a publication, so long as there were no restrictions as to the number of persons who on their application therefor would be supplied by appellant with copies thereof. "Unless the circulation of copies is restricted, both as to persons and purpose, it will amount to a publication." (7 Am. & Eng. Ency. Law, 2d ed., 523.)

In Jewelers' Mercantile Agency v. Jewelers' Weekly Publishing Company, cited above, relief was sought against the appropriation by one of the defendants in a publication of his own of certain material procured by him from a reference book compiled by plaintiff, and by it leased to a third person under a contract containing terms restricting its use. In discussing the contention made that the reference book, on account of the restrictions placed on its use by the terms of the contract of lease, had not been published, the Court of Appeals of New York said: "Cases have arisen in which there was a private circulation for a restricted purpose, and the holding has been that it did not constitute a publication, as in Prince Albert v. Strange, 2 DeG. & S., 652. In that case it appeared that Her Majesty and the Prince Consort had given to a number of friends copies of prints and etchings made for their own amusement, and this was held a private circulation and not a publication. Out of a few cases of the same general character seems to have grown the idea that it is possible for a man, by putting restrictions on the use of his book by subscribers, however numerous they may be, to retain in himself forever the common law right of first publication. If that opinion be sustained by the judgment of the courts, then will have been obtained judicial legislation of far broader scope and much greater value to authors and others than that offered by the copyright statute." After further discussing the proposition that restrictions placed by the seller upon the use to be made by the purchaser of a copy of a book, should be held to prevent the sale of such copy from operating as a publication of the book, the court, in concluding the opinion from which we have quoted, says: "Our examination leads us to the conclusion that the present state of the law is, that if a book be put within the reach of the general public so that all may have access to it, no matter what limitations may be put upon the use of it by the individual subscriber or lessee, it is published, and what it known as the common law copyright, or right of first publication, is gone."

We think it affirmatively appears from the allegations in appellant's petition that the contents of the sheets from its abstract books which it seeks to enjoin appellees from using, have been by it placed within the reach of all willing on its terms to become purchasers of its abstracts of title, and that it no longer can claim the exclusive right to multiply abstracts of title including those sheets. Its first assignment of error therefore is overruled, and the judgment of the court below is affirmed.

*Affirmed.*