**FURR'S INC., Appellant,**

v.

**UNITED SPECIALTY ADVERTISING COMPANY and United Specialty Production Company, Appellees.**

**No. 5450.**

Court of Civil Appeals of Texas.

El Paso.

Aug. 3, 1960.

Rehearing Denied Oct. 5, 1960.

Turpin, Kerr, Smith & Dyer, Midland, Crenshaw, Dupree & Milam, Lubbock, for appellant.

Stubbeman, McRae, Sealy & Laughlin, W. B. Browder, Jr., Milton L. Bankston, Midland, Hindin & Susman, Los Angeles, Cal., for appellees.

FRASER, Justice.

This is an appeal from an injunction order emanating from the District Court of Midland County, Texas. The temporary injunction enjoined appellant from continuing the use of an advertising plan in its grocery stores, which plan was known as the "Cash Circle Card", with accompanying store banners and bag stuffers. This controversy arose in the following manner:

In May, 1959, a Mr. Goulding, sales representative for appellees, called on appellant at its home or general office, in Lubbock, Texas. Goulding made this appointment and call in an effort to persuade appellant to purchase the product of his employer, which was called the "Cash Surprise Bonus Card." Bag stuffers and banners were to be furnished along with the purchase. These bonus cards had been prepared and developed by appellees. They were oblong cards with various money amounts printed around the periphery of the card. These amounts were from ten cents up to five dollars, and were to be punched out by the checker at the grocery store in accordance with the amount of the

customer's purchase. When the card was fully punched out, the customer would receive $1 as a bonus, and then an opportunity to get a surprise bonus. There was a small black square sewed in the card which could only be removed by a store employee or official. If the customer could answer the simple question contained therein, he might receive a bonus from one to one thousand dollars. Another feature of the card was that the customer could come in on Monday and get a free $2 punch, without having to purchase anything. There was no charge for these cards, and they were solely for the purpose of promoting sales in the grocery store. The card also contained a calendar device to keep track of the free punches, and the name of the store and some additional information or instruction. The appellant did not purchase any of these cards at the May meeting. In September of the same year, appellant called Goulding, or appellees, for another conference, at which time they purchased $10,000 worth of these cards, bag stuffers and banners. Shortly thereafter, they purchased another $2,200 worth. The record indicates that Goulding notified them that they could not buy cards for use in Midland or Odessa, as he had given the exclusive use of such cards in those two towns to a competitor of appellant, known as "Food Mart." Appellant bought the merchandise for use in a number of its other stores.

Shortly after this purchase, in September 1959, Food Mart began using the cards in the Midland-Odessa area. Appellant then asked an advertising agency in Lubbock to produce a promotion that would meet the competition of the use of appellees' cards by Food Mart in Midland and Odessa. A Mr. Webster, of the advertising agency, after some time produced the design involved here, and which was named "Cash Circle Cards". The Cash Circle Card involved the same method as appellees' card. It seems to differ only in that it is round, or circular; and, instead of punching out amounts of money, they are "branded". The arrangement of the card is somewhat different, but it must be admitted that it is substantially the same, and has the sewed-in square for the surprise bonus, as does appellees' card.

Appellees brought suit for a considerable sum of money, and asked that appellant be restrained from using its Cash Circle Cards.

As stated in the briefs, this is a "trade secret" case, and does not involve copyright or patent problems. Appellees state in their brief that it does not involve a claim of unfair competition, as such is generally considered.

We believe that the issues that are here decisive are: Do the Cash Surprise Bonus Cards of appellees constitute a trade secret; and, if so, was such obtained unfairly by appellant by means of a breach of confidence?

There is some discussion of unfair competition, but we do not believe that principle applicable here, because the necessary elements, which we will not detail, are not in evidence.

■ We will take up, first, the question of whether or not the bonus cards of appellees were so constructed and developed as to constitute a "trade secret". After studying the record and the authorities, we have reached the conclusion that they were not. The idea of punch cards, or bonus cards, was not only old, but had been used in many forms and manners and cards similar to these were currently in use at the time of the sale, in many other cities and states, and had been advertised in the newspapers very extensively. The card speaks for itself. The newspaper advertisements, the bag stuffers and banners merely advertise and urge people to take advantage of these cards, which were given out free. The cards themselves were self-explanatory on the face thereof. Appellant testified that it had used a somewhat similar device in 1950, whereby a customer, by virtue of his purchases, could buy cooking ware at a reduced price. Cards similar to these here involved were, and had been, in active use

in grocery stores in Los Angeles, Chicago, Fort Worth, etc. There are other types of punch cards, or bonus cards, in the record as evidence, and examination of these, coupled with the testimony of witnesses, does not establish, in our opinion, anything about these cards that would constitute a trade secret. It is true that the cards were developed and improved over the years by the appellees, but they were exhibited to and used by the public, and had been explained and advertised to the public for many months before appellant purchased them. We do not believe that the sewed-in square creates sufficient distinction to make this particular card such as could be protected under the trade secret doctrine. As was said by the Supreme Court: "The subject matter of a trade secret must be secret." Wissman v. Boucher, 150 Tex. 326, 240 S.W.2d 278, 280.

The court, in the above case, further says:

> " * * * the exposure of the device to the public by advertisement or sale definitely operates to destroy any legal protection the claimed originator might otherwise assert on the basis of a trade secret * * * matters which are completely disclosed by the goods which one markets cannot be his secret."

Again, these cards are completely explained by the language on the face thereof. It constitutes a complete disclosure of the method or scheme. The store in the cities named above had informed the public, by newspaper advertising, banners and bag stuffers, of the entire method of this cash bonus card. In other words, the entire device, or method, had been exhibited to the general public for many months before appellant made its purchase. It seems to us to be a merchandising device, not especially new in design or method, and containing no particular secret. While the cards here involved are certainly similar, we believe it is only that similarity which would necessarily occur when anyone used the punch card bonus idea, which is by no means a new or secret idea. To hold otherwise, we think, would be to encourage and condone a monopoly and create the effects of a copyright where no copyright exists. It seems to us that these cards are not a secret, but more of a promotion of doing business or advertising. Certainly appellant could have, and apparently did have, all the information about these cards before it bought them, or before it asked its advertising agency to produce something in competition at Midland and Odessa. As stated in 79 C.J.S. 935: "While it has been said that an exact definition of a trade secret is not possible, the courts nevertheless define a trade secret to be a plan or process, tool, mechanism, or compound, known only to its owner and those of his employees to whom it is necessary to confide it in order to apply it to the uses for which it is intended." This article later states: "Like any other secret, a trade secret is nothing more than a private matter; something known only to one or a few and kept from the general public, and not susceptible to general knowledge. There must exist a substantial element of secrecy, and the term 'trade secret' is not applied to matters of public knowledge, or of common knowledge to a trade, or of general knowledge in an industry, or *to matters which are completely disclosed by the goods which are marketed.*" (Emphasis ours). Here, of course, the cards were complete on their face, and were certainly offered and in use by the general public. We therefore hold that appellees' cards here involved, as constituted and sold, along with the bag stuffers and banners, do not come under the heading or meet the requirements of that which is a trade secret.

■■ With regard to the second point, we do not believe that appellant acquired any information about these cards in the course of any confidential relationship between it and appellees, or appellees' representative. This was merely a case of a salesman attempting to make a sale, in May of 1959. He does not say that he asked them to keep this matter secret, but

merely says that it was a confidential transaction because he had confidence in them. Appellees cite two cases which they consider extremely important; to-wit, Hyde Corporation v. Huffines, 158 Tex. 566, 314 S.W. 2d 763, and K & G Oil Tool & Service Co. v. G & G Fishing Tool Service et al., 158 Tex. 594, 314 S.W.2d 782. In these cases, however, the creator or inventor had produced a mechanical device and had engaged in negotiations and conversations with the defendants relative to their making and marketing his product with payment of a royalty to him. It was, of course, necessary there for the individual to explain and probably demonstrate the article involved, not with the idea of selling it, however, but with the idea that it would be manufactured by the other party under a contractual relationship, a type of licensing, perhaps. We think those cases are different from the case here, of a salesman offering for sale something that has long been in use, was well known to the purchaser, and had been widely presented to and advertised to the public. The use of someone else's idea is not automatically a violation of the law. It must be something that meets the requirements of a "trade secret" and has been obtained through a breach of confidence in order to entitle the injured party to damages and/or injunction. The Federal court stated, in G. W. Cole Co. v. American Cement & Oil Co. et al., 7 Cir., 130 F. 703, 708, as follows:

"The law of unfair trade has never gone to the length of preventing fair competition in trade. The law seeks only to restrain fraudulent practices inducing confusion of goods and deception of the public. There is nothing in the relation of these parties which prohibited such competition. The Excelsior Supply Company was a customer of the appellant, buying largely of its product 'Three in One.' It had special terms from the appellant, as had all its large customers; but that course of business created no trust relation between them, and constitutes no objection to competition."

There is a long line of cases holding that the courts will protect, where one obtains a thing by violation of a trust, or where one, by some other wrongful act, becomes an involuntary trustee. O'Bear-Nester Glass Co. v. Antiexplo Co., 101 Tex. 431, 108 S.W. 967, 16 L.R.A.,N.S., 520; Harrison v. Riddell, 64 Mont. 466, 210 P. 460, at page 464; Franke et al. v. Wiltschek, 2 Cir., 209 F.2d 493; 170 A.L.R. 488. Here, however, as we have stated above, we cannot find that appellant obtained any trade secret from appellees by the breach of any confidential relationship. As we have heretofore said, the cards and other advertising were self-explanatory and had been widely distributed to and presented to the public. There is no evidence that the appellees' representative, Goulding, asked appellant to treat any of these matters confidentially. As a matter of fact, we do not know what could have been confidential, other than the price paid by appellant, as the entire operation of this promotion had been and was to be carefully explained to the public.

■ Therefore, because we do not believe there is a trade secret here involved, and because we do not believe that any information that appellant's advertising agency might have used was improperly obtained or obtained through breach of confidence, we must hold that there was not sufficient reason or justification to warrant the trial court in granting the injunction. On the basis of what we have just stated, we do not believe the argument of maintaining status quo has any substantial merit.

Appellant has raised other points, to-wit, that the injunction violates the Texas anti-trust laws; that the cards and the use thereof is against the public policy of the State, and that appellees did not show that they did not have adequate and available remedies of law. We do not find merit in any of these points, and will overrule them without discussion.

For the reasons stated above, the temporary injunction heretofore granted by the trial court is dissolved and dismissed.