UNITED STATES SPORTING
PRODUCTS, INC., et al.,
Appellants,

v.

JOHNNY STEWART GAME
CALLS, INC., Appellee.

No. 10–92–219–CV.

Court of Appeals of Texas,
Waco.

Sept. 29, 1993.

Bob E. Shannon, Joseph R. Knight, Baker & Botts, L.L.P., Austin, for appellants.

P.M. Johnston, Minor L. Helm, Jr., Sleeper, Johnston, Helm & Fontaine, P.C., Waco, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

Johnny Stewart started his business, Johnny Stewart Game Calls, Inc. (Game Calls), by venturing into the wild and either recording animal sounds in the animals' natural habitats or capturing the animals to record their sounds in a more conducive setting. The recording process itself was long and labor intensive. Stewart travelled extensively to gather a variety of sounds. To get a satisfactory sample, he would record an animal on several occasions, attempting to eliminate unwanted background noise such as an airplane overhead or a passing automobile. Even then, the resulting animal sounds might not be adequate on any given occasion. To overcome these problems, the sample of several seconds would be edited and "looped" repetitiously to occupy a full-length cassette tape. Hunters and photographers purchased Stewart's tapes and used them to draw animals into close range.

United States Sporting Products, Inc. (Sporting Products) allegedly copied sounds from nineteen of Stewart's tapes and marketed them in competition with Game Calls. Gerald Stewart, Johnny Stewart's son and president of Game Calls, confronted John Bowling (Bowling), Sporting Product's president, on several occasions asking that Bowling cease his practices. Bowling insisted that he was doing nothing improper and that he was purchasing his sounds in good faith from a third party. Game Calls brought this suit. After finding that Sporting Products and Bowling misappropriated recordings of various animal sounds gathered and marketed by Game Calls, a jury assessed $209,000 in actual damages and $482,125 in exemplary damages. The court entered judgment against Sporting Goods and Bowling for actual damages, exemplary damages, attorney's fees for defending a counterclaim, and permanent injunctive relief requiring them to stop selling the tapes and to recall tapes from distributors and dealers they could identify.

## POINTS ON APPEAL

Sporting Products and Bowling bring six points of error:

1. The court erred in rendering judgment for Game Calls because it had no cause of action against Bowling and Sporting Products for the claimed misappropriation.

2. The court committed reversible error by commenting on the weight of the evidence.

3. The court erred in rendering judgment against Bowling because there was no jury finding that he knowingly participated in the claimed tortious conduct.

4. The court erred by failing to require specific findings of both liability and damages against both Bowling and Sporting Products.

5. The court erred in rendering judgment for exemplary damages because there was no jury finding that Appellants acted with "actual malice."

6. The court erred by not ordering a remittitur of exemplary damages.

We will overrule all the points and affirm the judgment.

## MISAPPROPRIATION

In their first point, Appellants contend that Game Calls failed to state a claim for misappropriation as it is recognized in Texas. They make three arguments in support of this point. First, they cite *Loeb v. Turner*, 257 S.W.2d 800, 803 (Tex.Civ.App.—Dallas 1953, no writ), for the proposition that, once Game Calls published the uncopyrighted sounds, they were available for public use. Second, Appellants argue that, to the extent misappropriation may be recognized, it is

limited only to matters of "time value." *See Synercom Technology, Inc. v. University Computing Co.*, 474 F.Supp. 37, 44 (N.D.Tex. 1979). Finally, they argue that Game Calls is entitled only to the equitable relief that was granted—not monetary relief. We find that injunctive relief is not Game Calls' sole remedy for misappropriation.

RECOGNITION OF CAUSE OF ACTION

We first note the difference between unfair competition as a general area of law and the specific causes of action that it subsumes. "The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir.1974). Within the broad scope of unfair competition are the independent causes of action such as trade-secret law, "palming off" or passing off, and misappropriation, to name only a few. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 130 at 1013–30 (5th ed. 1984); *see also Universal City Studios v. Kamar Industries*, 217 U.S.P.Q. 1162, 1982 WL 1278 (S.D.Tex.1982) (stating, "The doctrine of misappropriation is a branch of the tort of unfair competition which involves the appropriation and use by the defendant, in competition with the plaintiff, of a unique pecuniary interest created by the plaintiff through the expenditure of labor, skill and money. [cites omitted] It is recognized under Texas law.") (approved in *Conan Properties, Inc. v. Conan's Pizza, Inc.*, 752 F.2d 145, 156 (5th Cir.1985)).

The tort of misappropriation takes root in federal common law. The Supreme Court first espoused a guideline for misappropriation in *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). After the International News Service took news items gathered by Associated Press and sold them competitively, the Court recognized a claim, saying:

> [T]his defendant ... admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is saleable by complain-

ant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown ... with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business.

*Id.* at 239, 39 S.Ct. at 72–73. The court further recognized that, because of the great expense of acquiring and transmitting it, the news carries "all the attributes of property necessary for determining that a misappropriation of it by a competitor is unfair competition...." *Id.* at 240, 39 S.Ct. at 73.

The Supreme Court's reasoning was later adopted by a Texas court in *Gilmore v. Sammons*, 269 S.W. 861, 863 (Tex.Civ.App.—Dallas 1925, writ ref'd). *Gilmore* was factually similar to *International News Service* in that Gilmore sought to protect his property interest in news items from Sammons' appropriating the items, republishing them as his own, and selling his publication in competition with Gilmore. The court recognized Gilmore's misappropriation claim. *Id.*

In support of their proposition that the misappropriation doctrine has not been expressly embraced in Texas, Appellants cite *Schuchart & Assoc. v. Solo Serve Corp.*, 540 F.Supp. 928, 944 (W.D.Tex.1982) (stating that Texas courts have not expressly embraced a cause of action for misappropriation). However, we believe the *Schuchart* court misapplied Texas unfair-competition law. The court cited three cases in support of its proposition, but two of them are trade-secret cases rather than misappropriation cases. *Id.* at 944 n. 11. The trade-secret cases are *Wissman v. Boucher*, 150 Tex. 326, 240 S.W.2d 278 (1951) and *Furr's Inc. v. United Specialty Advertising Co.*, 338 S.W.2d 762 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r.e.). The misappropriation case is *Loeb*.

In *Wissman*, the issues before the court were whether the defendants "misappropriated" plaintiff's ideas in violation of trade-secret law and whether the defendants "misappropriated" the ideas for the purposes of

palming off. The court held that there could be no trade secret in an idea of general knowledge in an industry; thus, there could be no wrongful taking. *Wissman,* 240 S.W.2d at 280. The court also found that no evidence supported the contention of a wrongful taking for the purposes of palming off. *Id.* at 281. Contrary to the *Schuchart* court's assertion that *Wissman* assumed an action for misappropriation, the *Wissman* court did not address "misappropriation" as an independent cause of action. *Wissman* only addressed the term as it is commonly understood in ordinary language to mean a wrongful taking or an appropriation intrusive to another's interests, be it by violations of trade secret, palming off, or otherwise. *Id.* at 280–81.

The *Schuchart* court similarly misconstrued *Furr's Inc.* In characterizing the holding in *Furr's,* the *Schuchart* court stated, "[T]he Court suggested that the misappropriation must be of a trade secret or in violation of a confidence." *Schuchart,* 540 F.Supp. at 944 n. 11. However, we interpret *Furr's* as holding that one may state a claim under unfair competition for violation of trade-secret law by showing a breach of confidence. *See Furr's,* 338 S.W.2d at 764. Again, the *Schuchart* court confused a "misappropriation" of a trade secret by breach of confidence with "misappropriation" as a cause of action.

Finally, although the *Schuchart* court correctly characterized the holding in *Loeb* as denying a property interest in news items, *Loeb* was mistaken in another facet of its analysis. *Loeb* correctly stated that the news itself cannot become the subject of a property right belonging exclusively to any one person but failed to distinguish between newsworthy events as they exist in the public domain and the news as it is reported as the product of one's efforts. *Loeb,* 257 S.W.2d at 803; *see also International News Service,* 248 U.S. at 234, 39 S.Ct. at 70–71.

Both business competitors and the public can gather and communicate information squarely in the public domain such as newsworthy events or, as in this case, animal sounds. For example, Sammons and the International News Service could have gathered and reported the news events from a source other than their competitor's publications. Similarly, Appellants could have refrained from using Game Calls' tapes as a source of information. By recognizing a property right in the product of one's effort, misappropriation does not extend any property interest to matters in the public domain.

■ We recognize the elements of misappropriation as: (i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (*i.e.,* a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff. *See Synercom Technology, Inc.,* 474 F.Supp. at 39; *see also Universal City Studios,* 217 U.S.P.Q. 1162, 1982 WL 1278 (stating, "[Misappropriation] is recognized under Texas law").

PUBLICATION DEFENSE

Appellants ask that we follow the rationale of *Loeb* and allow publication as a defense. *See* 257 S.W.2d at 803. In *Loeb,* an Arizona radio station sued a Texas radio station for recreating a live broadcast of an automobile race. The Texas station sent an agent to within the forty-mile broadcasting range of the Arizona station. The agent listened to the Arizona broadcast and communicated the information by telephone to the Dallas station where an announcer pretended to narrate the events as they occurred.

First, the court noted that the stations were over one thousand miles apart and in no way competed or interfered with each other, hence no claim under unfair competition could have arisen. This fact alone refutes a misappropriation claim because the element of competition is not satisfied; however, the court further stated that, once uncopyrighted news items are published, they become available for everyone's use. *Id. Vernon Abstract Co. v. Waggoner Title Co.,* on which the *Loeb* court relied as authority for this proposition, dealt with the attributes of common-law property rights in a manuscript.

*Id.; Vernon Abstract Co. v. Waggoner Title Co.,* 107 S.W. 919, 921 (Tex.Civ.App.1908, no writ). The *Vernon Abstract* court had held that, before publication or disclosure, the property and the right to its exclusive use can be withheld from all, or assigned or transferred to another, but that after publication anyone can copy and use the work for his own purposes, assuming no other legal transgressions. *Vernon Abstract Co.,* 107 S.W. at 921. However, *Vernon Abstract* preceded both *International News Service* and *Gilmore,* and the later courts had not yet played their respective hands in delineating the equitable bounds of unfair competition. *See International News Service,* 248 U.S. 215, 39 S.Ct. 68; *Gilmore,* 269 S.W. 861. The defendants in both *Gilmore* and *International News Service* had presented this common-law publication defense, and each defense was flatly rejected. *Id.*

"TIME-VALUE" DEFENSE

■ Citing *Synercom Technology,* Appellants argue that, to the extent misappropriation is recognized in Texas, it is limited to matters with "time value" such as news items. We disagree. *See* 474 F.Supp. at 44. *Synercom Technology* recognizes that "the misappropriation doctrine typically extends protection for a limited period of time to matters with time value." *Id.* This, in itself, is a correct statement of law. By definition a court can only afford protection under misappropriation to matters with time value for that period of time during which those matters carry a commercial value to the complainant. However, this concept does not limit the applicability of misappropriation to those items having an obviously limited time value such as news items. In other words, a complainant has a protectable property interest in the product of his labor, regardless of the subject matter, so long as that matter confers on him a commercial advantage. In fact, the *Synercom Technology* court itself stated, "Whether the doctrine of misappropriation even extends beyond the realm of matters with time value such as news or broadcasts of sports events is a question that need not be decided here." *Id.* at 44 n. 7; *see also Universal City Studios,* 217 U.S.P.Q. 1162, 1982 WL 1278 (applying misappropriation to product-licensing arrangements); *In-*

*ternational News Service,* 248 U.S. at 232, 39 S.Ct. at 70 (affirming a lower appellate court's ruling granting an injunction "against any bodily taking of the words or substance of complainant's news *until its commercial value as news had passed away*" (emphasis added)); *Gilmore,* 269 S.W. at 862 (where the court assumed that particular items had a commercial value for a six-month period).

REMEDY FOR MISAPPROPRIATION

Finally, Appellants argue that, even if *Gilmore* correctly states Texas law on misappropriation, equitable relief is the only remedy to which Game Calls is entitled. We disagree. Gilmore asked for temporary and permanent injunctive relief as well as for the value of 374 news items at $1.50 each. *Gilmore,* 269 S.W. at 862. The lower court denied the temporary injunction, and the case proceeded on interlocutory appeal. The reviewing court never addressed the remedies available, except to grant the temporary injunction and remand the cause for determination of the merits. *Id.* at 863. Similarly, *International News Service* proceeded only to the stage of preliminary injunction. 248 U.S. at 231, 39 S.Ct. at 70. However, the Supreme Court recognized a monetary interest in protecting one's right to the product of his own labor. *Id.* at 236, 39 S.Ct. at 71. The Court stated, "The rule that a court of equity concerns itself only in the protection of property rights treats *any civil right of a pecuniary nature as a property right.*" *Id.* (emphasis added).

■ It would be incongruous for us to recognize a monetary value of property for the purposes of stating a claim, but not for the purposes of granting relief. If only injunctive relief were available for a misappropriation claim, tortious conduct would take the posture of an ordinary business decision allowing a defendant to keep his ill-gotten gain. Further, to allow compensatory damages without exemplary damages would serve as no deterrent because a defendant would, in effect, be only made to return what was not his in the first place. We hold that both compensatory and exemplary damages

are recoverable for misappropriation in addition to injunctive relief.

We overrule point one.

## COMMENT IN COURT'S CHARGE

Appellants argue that the trial court committed error by commenting on the weight of the evidence in the charge. The portion of the jury charge at issue reads:

> You are instructed that when an individual or business creates a product through extensive time, labor, skill and money, that person or business is protected by law from the misappropriation of that product by others in competition who would gain a special advantage because they would be burdened with little or none of the expense of development. The term "misappropriation" means the wrongful taking and use of another's property. *The unauthorized copying and sale of another's tapes would constitute misappropriation.*
>
> QUESTION NO. 1:
>
> Do you find from a preponderance of the evidence, if any, that Defendants United States Sporting Products, Inc. and John Bowling misappropriated the Johnny Stewart Game Calls, Inc.'s tapes at issue in this lawsuit?
>
> Answer "Yes" or "No".
>
> Answer: Yes

(Emphasis added).

Appellants argue that, after defining "misappropriation" as "the wrongful taking and use of another's property," the trial court gave an erroneous instruction. They argue that the next statement, "the unauthorized copying and sale of another's tape recordings would constitute misappropriation," was a comment on the weight of the evidence which eviscerated Appellant's good-faith-purchaser defense. We disagree.

■■■ Error occurs when the trial judge directly comments on the weight of the evidence, suggesting the judge's opinion concerning the matter put to the jury. *Linden–Alimak, Inc. v. McDonald,* 745 S.W.2d 82, 85 (Tex.App.—Ft. Worth 1988, writ denied). The court may, however, personalize or individualize the charge to the facts of the case

so the jury can more easily understand the law. *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 821 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. denied,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). A proper instruction is one that assists the jury and is legally correct. *Id.* at 822. We believe that the statement at issue was a permissible explanatory instruction, proper in enabling the jury to render a verdict. *See* Tex.R.Civ.P. 277.

Appellants concede that the first statement, " 'misappropriation' means the wrongful taking and use of another's property," could have supported a finding of liability because it inquired whether Appellants acted "wrongfully." Thus, if the jury believed that Appellants were good-faith purchasers, the jury could find that they did not act "wrongfully" and absolve them of liability. However, Appellants argue that because the court included the second statement—"the unauthorized copying and sale of another's tape recordings would constitute misappropriation"—the jury was erroneously foreclosed from distinguishing between the "Appellants" acting wrongfully and Appellants as mere "sellers" acting within their rights. In other words, Appellants contend that, even if the jury believed that they were good faith purchasers, the court's instruction required the jury to find liability if it believed that whoever sold Appellants the tapes misappropriated them.

We, however, read the second statement to be a permissible clarification of the first. *See id.* The first statement serves as a brief definition of misappropriation law. The second only demonstrates its application to the particular case at hand, that of copying and selling another's tapes, and as such, is an accurate statement of law. In answering "yes" to question one, the jury necessarily found that Appellants were the actors who misappropriated the tapes at issue, whether misappropriation is defined as a "wrongful taking and use of another's property" or as an "unauthorized copying and sale of another's tapes."

We overrule point two.

## LIABILITY FINDINGS

■ Bowling argues in point three that there was no finding of his knowing participation in the misappropriation to render him personally liable. As a general rule, a corporate agent may not be held personally liable in a suit against the corporation. However, if that agent knowingly participated in the tort, he becomes liable as a joint tort-feasor. *Permian Petroleum Co. v. Barrow*, 484 S.W.2d 631, 634 (Tex.Civ.App.—El Paso 1972, no writ). "It is not necessary that the corporate 'veil' be pierced or even discussed. An officer or any other agent of a corporation may be personally as responsible as the corporation itself for tortious acts when participating in the wrongdoing." *Id.; see also Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 541 (Tex.App.—Corpus Christi 1989, writ denied).

■ The jury's answers to two questions in the charge were equivalent to a finding of knowing participation by Bowling. First, the jury found in its affirmative answer to question one that "Defendants United States Sporting Products, Inc. *and John Bowling* misappropriated the [Game Calls] tapes." (Emphasis added). Second, the jury found in question three "that the misappropriation by United States Sporting Products, Inc. *and John Bowling* ... was committed *knowingly, willfully, and deliberately.*" (Emphasis added). By naming both Appellants conjunctively in the charge, the jury found their participation sufficient to render both Sporting Products and Bowling independently liable as joint tort-feasors.

Because the jury found that Bowling knowingly participated in the misappropriation, we will not discuss the alternative "alter ego" theory of liability. We overrule point three.

## EXEMPLARY DAMAGES

In two points Appellants attack the award of exemplary damages.

SEPARATE ASSESSMENTS

In point four they argue that the court should have required separate exemplary damage findings against both Sporting Products and Bowling. Appellants cite *St. Gelais*

*v. Jackson*, 769 S.W.2d 249, 259–260 (Tex. App.—Houston [14th Dist.] 1988, no writ), for the proposition that co-defendants are not jointly and severally liable for exemplary damages and that "[t]he criteria used in setting the amount of exemplary damages demand individual assessment by the jury of each defendant's conduct, situation, sensibilities, and culpabilities." *Id.* at 260. Appellants also rely on section 41.005 of the Civil Practice and Remedies Code:

> In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant.

TEX.CIV.PRAC. & REM.CODE ANN. § 41.005 (Vernon Supp.1993).

First, Appellants' reliance on section 41.005 is misplaced because it does not apply to intentional torts. Section 41.002 states, "This chapter applies to an action in which a claimant seeks exemplary damages relating to a cause of action as defined by Section 33.001." *Id.* § 41.002(a) (Vernon Supp.1993); *see also Transfer Products, Inc. v. TexPar Energy, Inc.*, 788 S.W.2d 713, 717 (Tex. App.—Corpus Christi 1990, no writ). Section 33.001, in turn, applies only to actions for negligence, products liability grounded in negligence, strict tort liability, strict products liability, breach of warranty under Chapter 2 of the Business and Commerce Code, and negligence relating to professional services. TEX.CIV.PRAC. & REM.CODE ANN. § 33.001 (Vernon Supp.1993).

■ Second, separate findings of exemplary damages are not necessary when the defendants are closely related. The acts, conduct, and intent of Bowling as the president of Sporting Products and as an individual were the subject of the jury's determination. Bowling acted for both; thus, his intention, conduct, and acts were attributable to both. *See Norton Refrigerated Express, Inc. v. Ritter Bros. Co.*, 552 S.W.2d 910, 913 (Tex.Civ.App.—Texarkana 1977, writ ref'd n.r.e.) (referring to a president/corporation relationship); *see also Transfer Products*, 788 S.W.2d at 717 (referring to a corporation/wholly-owned subsidiary relationship).

When defendants are unrelated, separate assessments of their individual conduct, situations, sensibilities, and culpabilities makes individual findings a more rational and probably necessary procedure. *St. Gelais,* 769 S.W.2d at 260. Here, however, there is no rational interest to be served by requiring a jury to go through the needless repetition of independent findings on liability and damages when the defendants are so interrelated that the actions of one are necessarily the actions of both. *See Norton Refrigerated Express,* 552 S.W.2d at 913.

We overrule point four.

MALICE

■■■ The jury found that Appellants committed the misappropriation "knowingly, willfully, and deliberately." Appellants assert in point five that the court erred by not requiring a finding of actual malice to support the exemplary-damages award. Generally stated, a jury must find actual malice or implied malice to award exemplary damages. Actual malice is defined as "ill-will, spite, evil motive, or purposing the injuring of another." *Clements v. Withers,* 437 S.W.2d 818, 822 (Tex.1969). Implied or legal malice exists when wrongful conduct is intentional and without just cause or excuse. *Transfer Products,* 788 S.W.2d at 715; *Horton v. Robinson,* 776 S.W.2d 260, 265 (Tex.App.—El Paso 1989, no writ).

Appellants argue that a misappropriation claim is analogous to tortious interference with a contract, where actual malice is the necessary standard for exemplary damages. They rely on interference cases dealing generally with business conduct and profit motive. *See Clements,* 437 S.W.2d at 822; *Anthony Pools, Inc. v. Charles & David, Inc.,* 797 S.W.2d 666, 677 (Tex.App.—Houston [14th Dist.] 1990, writ denied). Appellants also cite *Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206 (Tex.App.—Houston [14th Dist.] 1991, no writ), to support their position that business competitors may make decisions motivated purely by their selfish desire to increase their own profits "at the expense of their competitors." They argue that within a business context, because business is itself profit motivated, a jury

finding of actual malice should be required to support exemplary damages.

■■■ We disagree with Appellants' interpretation of *Times Herald Printing.* That court quoted with approval a jury instruction which stated, "a person is privileged or justified to interfere with the business relations of another with the motive and purpose, at least in part, to advance or protect his own business or financial interests." *Id.* at 215. However, no mention is made of one business parasitically profiting at the expense of another as is the nature of misappropriation. If Appellants' argument were correct, every tortious act arising in the context of business would be privileged, regardless of any resultant harm to competitors, because the act would arguably be profit motivated. Also, the court's charge in *Times Herald Printing* reflected tortious-interference law with regard to liability, not exemplary damages. *Id.* If a jury should find that a defendant had interfered with a complainant's contract, but did so only to advance its legitimate business interests, then the defendant is absolved of *all liability.* Privilege does not apply to exemplary damages in interference cases; nor will we apply it to the exemplary-damage issue here.

■■■ Game Calls, on the other hand, asserts that misappropriation is analogous to conversion, where implied or legal malice is sufficient to support exemplary damages. *See Morey v. Page,* 802 S.W.2d 779, 787 (Tex.App.—Dallas 1990, no writ) (citing *Steakley Bros. Chevrolet, Inc. v. Westbrook,* 558 S.W.2d 544 (Tex.Civ.App.—Waco 1977, writ ref'd n.r.e.)); *Transfer Products,* 788 S.W.2d at 713. In fact, the only real difference between the two causes of action is that conversion typically deals with chattels, and misappropriation deals with intangible property. We hold that implied or legal malice is the appropriate standard for assessing exemplary damages for misappropriation. *See G.A.I. Audio of New York, Inc. v. Columbia Broadcasting System, Inc.,* 27 Md.App. 172, 340 A.2d 736, 753–56 (Md.Ct.Spec.App.1975) (applying the implied- or legal-malice standard to misappropriation). Further, *Morey* holds that malice may be implied from a knowing conversion of another's property

without justification, and we see no reason why that rule should not be applied to misappropriation. *See Morey,* 802 S.W.2d at 787. The evidence shows that Game Calls confronted Bowling on several occasions asking that Bowling cease his practices and that Bowling insisted he was doing nothing improper because he was purchasing his sounds in good faith from a third party. In view of the jury's resolution of the issue of misappropriation, we hold that this evidence, coupled with the finding that Appellants committed the misappropriation "knowingly, willfully, and deliberately," is sufficient to support the award of exemplary damages. *Id.* We overrule point five.

## REMITTITUR

Appellants argue in point six that the jury's exemplary-damages award of $482,125 was excessive and that the court erred in not ordering a remittitur. The record, however, supports the jury's assessment. Game Calls introduced evidence that Appellants gradually re-recorded the offending tapes with other material only after negotiations for the sale of Sporting Products' assets had commenced and Sporting Products was about to indemnify the purchaser against Game Calls' claim and warrant that no duplication had occurred. Despite over $1 million in revenue a year, Bowling could not say how many of the offending tapes had been sold or were still in the hands of distributors. In addition, the jury heard evidence that Bowling's tax return included approximately $180,000 from his business earnings.

Appellants do not contest the jury's finding of $209,000 in actual damages. Exemplary damages must be reasonably proportioned to actual damages. *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex. 1981). No set rule or ratio exists to make the determination; it depends on the facts of each particular case. *Id.* The amount of an award of punitive damages rests largely in the discretion of the jury. *Miles Homes Div., Insilco Corp. v. Smith,* 790 S.W.2d 382, 385 (Tex.App.—Beaumont 1990, writ denied). Factors to consider in determining whether an award of punitive damages is excessive include: (1) the nature of the wrong, (2) the character of the offending conduct, (3) the degree of culpability of the person against whom the damages were awarded, (4) the relative situation and sensibilities of the parties, (5) the extent to which the conduct offends a public sense of justice and propriety, and (6) the net worth of the defendant. *Alamo Nat'l Bank,* 616 S.W.2d at 910; *Lunsford v. Morris,* 746 S.W.2d 471, 473 (Tex. 1988) (orig. proceeding); *Beverly Enterprises of Texas, Inc. v. Leath,* 829 S.W.2d 382, 388 (Tex.App.—Waco 1992, writ denied).

We do not believe that the award of exemplary damages in this case, less than three times actual damages, is unreasonable proportioned to the award of actual damages. *See Alamo Nat'l Bank,* 616 S.W.2d at 910. We overrule point six.

We affirm the judgment.