

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
### FORT WORTH

---

NO. 2-08-144-CV

---

ASTORIA INDUSTRIES OF IOWA, INC.                    APPELLANT

V.

BRAND FX BODY COMPANY                               APPELLEE

------------

FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

In six issues, appellant Astoria Industries of Iowa, Inc. (Astoria) complains of the trial court's judgment awarding appellee Brand FX Body Company (Brand FX) damages in the amount of $705,000 for trade dress infringement and common law misappropriation, $682,200 for false advertising, and $400,000 in attorney's fees on appellee's trade dress infringement and false advertising

---

[1] *See* Tex. R. App. P. 47.4.

claims, in addition to $150,000 for attorney's fees on appeal. We affirm the judgment as modified.

## I.    BACKGROUND AND JURISDICTIONAL FACTS

Astoria and Brand FX are business competitors. They manufacture and sell fiberglass utility bodies and work toppers[2] for commercial vehicles. Brand FX's work topper uses a stair-step roof line that it claims is unique and brand-distinguishing. Initially, Astoria's topper had a rounded or domed roof line. In late 2002, however, Astoria developed a topper with a stair-step roof design virtually identical to Brand FX's topper.

Astoria engineer Randy Thole acknowledged that Astoria developed its stair-step topper to be as similar to Brand FX's design as possible. Astoria obtained from one of its customers, Cook's Pest Control (Cook's), the engineering drawings of Brand FX's predecessor, Fibre Body, and used a Fibre Body topper from Cook's as a "plug"[3] to make a mold to manufacture its look-

---

[2]... "Utility bodies" are covered cabinets that mount on the back portion of a commercial truck frame, and "work toppers" are covered cabinets placed on top of a pickup truck bed. Brand FX's utility bodies are the subject of its false advertising claim, and the stair-step roof design of its work topper is the subject of its trade dress infringement claim. Trade dress refers to the design or packaging of a product that serves to identify the product's manufacturer or source. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28, 121 S. Ct. 1255, 1259 (2001).

[3]... A plug is typically a wooden part that is supposed to look identical to the finished product and used to build a mold. The mold is then used to

alike topper. Astoria then sold its stair-step toppers to Cook's for approximately one-half of the price charged by Brand FX.

Thereafter, in February 2003, Astoria began running a "DARE TO COMPARE" advertisement for its utility bodies in an industry trade journal. The advertisement ran ten times over the course of fourteen months. The advertisement begins by stating, "When choosing fiberglass utility bodies, Astoria Industries of Iowa should be your supplier!" The advertisement compares "High Quality Astoria Bodies vs. Low Quality Brand X Bodies." Regarding the latter, the advertisement states: (1) "[B]uilt with sub-standard materials"; (2) "Short term cost with long term expenses"; (3) "Built to their standard"; and (4) "1-year warranty."

In late May 2003, Brand FX notified Astoria of Brand FX's belief that the "DARE TO COMPARE" advertisement was false and disparaging and asked Astoria to stop running it. Brand FX contended that Astoria's reference to "Brand X Bodies" was a poorly-disguised reference to Brand FX and that the advertisement's first three statements about Brand FX are demonstrably false. Astoria continued to run the advertisement for another eleven months.

produce the finished product to the dimensions of the plug.

3

As a result of Astoria's conduct, Brand FX sued Astoria under the Lanham Act[4] for infringement of its trade dress topper design and false advertising of utility bodies.  Brand FX also brought claims of business disparagement, defamation per se, common law and trade secret misappropriation, and tortious interference with prospective relations.  Astoria obtained summary judgment dismissing Brand FX's business disparagement claim,[5] and the remaining claims were presented to the jury.

---

[4] 15 U.S.C.A. § 1125(a) (West 2009).  The Lanham Act provides civil remedies for trade dress infringement and false advertising of trademarks or trade dress.  *See id.*  Section 1125(a) specifically provides:

> Any person who . . .
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.*

[5] *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 639 (Tex. App.—Fort Worth 2007, pet. denied) (op. on reh'g) (reversing, on interlocutory appeal, trial court's order denying Astoria's requested summary judgment and rendering take nothing judgment on Brand FX's business disparagement claim).

The jury found Astoria liable for trade dress infringement and common law misappropriation and determined that Astoria gained $705,000 in profits on sales of its toppers as a result. The jury also found that Astoria committed false advertising of its utility bodies and that Brand FX's corrective advertising damages totaled $52,200, but they determined that the false advertising resulted in no profits for Astoria. Brand FX moved for judgment notwithstanding the verdict (JNOV) on the jury's finding that Astoria gained no profits from its false advertising and asked for an award of $4,200,000 in profits on the false advertising claim. The trial court granted Brand FX's motion in part, awarding it $630,000 in Astoria's profits for false advertising, in addition to the award on the jury verdict of $705,000 in profits on the trade dress infringement claim. The judgment also awarded Brand FX $400,000 in attorney's fees on the trade dress and false advertising claims and $150,000 in additional attorney's fees on appeal. This appeal followed.

## II.    ISSUES

In its first two issues, Astoria contends that the evidence is not legally and factually sufficient to support two necessary elements of Brand FX's trade dress claim: that the stair-step topper design at issue is not functional and that

5

the design has acquired a secondary meaning.[6] Third, Astoria contends that Brand FX's state law design misappropriation claim is preempted by federal patent law. Fourth, Astoria challenges the legal and factual sufficiency of evidence supporting the award of its profits on Brand FX's false advertising claim. Fifth, Astoria contends that the trial court erroneously admitted hearsay testimony without qualification and that this testimony is the only evidence supporting the award of corrective advertising costs on the false advertising claim. Sixth, Astoria complains that the award of attorney's fees is not authorized and, alternatively, that the appellate attorney's fee award is not properly conditioned on a successful appeal.

---

[6] *See* 15 U.S.C.A. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11, 215, 120 S. Ct. 1342–43, 1346 (2000) (holding trade dress is included under Lanham Act's trademark protections if it is inherently distinctive or distinctiveness is acquired by developing secondary meaning, which denotes that, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself").

### III.   SUFFICIENCY OF THE EVIDENCE SUPPORTING BRAND FX'S TRADE DRESS INFRINGEMENT CLAIM

#### A.   Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.[7]  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[8]

Anything more than a scintilla of evidence is legally sufficient to support the finding.[9]  When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the

---

[7]... *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

[8]... *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

[9]... *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

evidence is no more than a scintilla and, in legal effect, is no evidence.[10] More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.[11]

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[12]

## B.    Trade Dress Infringement—Functionality

To prevail on a claim of trade dress infringement under the Lanham Act, a plaintiff must prove three elements: (1) the packaging or design is not primarily functional, (2) it has acquired a "secondary meaning" by which the public identifies it with the source of the product rather than merely the product

---

[10] ... *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

[11] ... *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

[12] ... *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

itself, and (3) the alleged infringement creates a likelihood of confusion.[13] The burden of proof is on the person who asserts trade dress protection.[14] All three elements are questions of fact for the jury.[15]

Generally, a product is functional if it (1) is essential to the use or purpose of the article, or (2) affects the cost or quality of the article.[16] If the asserted trade dress is not functional under this initial test, courts may also consider the "competitive necessity" test of whether the exclusive use of the feature or design "would put competitors at a significant non-reputation-related disadvantage."[17]

---

[13]... *See* 15 U.S.C.A. § 1125(a); *TrafFix*, 532 U.S. at 28, 121 S. Ct. at 1257; *Samara Bros.*, 529 U.S. at 210–11, 215, 120 S. Ct. at 1342–43, 1346.

[14]... *See* 15 U.S.C.A. § 1125(a)(3) (providing that burden is on person asserting protection to prove trade dress is not functional when trade dress is unregistered); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 n.4, 112 S. Ct. 2753, 2756 n.4 (1992) (holding burden is on manufacturer to establish secondary meaning when trade dress is not inherently distinctive).

[15]... *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 537 (5th Cir. 1998), *abrogation on other grounds recognized by Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 356 (5th Cir.), *cert. denied*, 537 U.S. 1071 (2002).

[16]... *TrafFix*, 532 U.S. at 32–33, 121 S. Ct. at 1261–62. Without objection, the jury was instructed that "[a] product feature is considered functional if it is essential to the use or purpose of the product or if it affects the cost or quality of the product."

[17]... *Id.*; *see also Eppendorf-Netheler-Hinz GMBH*, 289 F.3d at 356.

9

The jury in this case found that the asserted trade dress, Brand FX's stair-step topper design, is "primarily non-functional." Astoria contends that the evidence is not legally sufficient to support this finding.

To establish that the stair-step design is primarily nonfunctional, Brand FX offered the testimony of its owner and operator, Alfred Finley. Finley has been in the industry since 1969. He formed and ran Fibre Body from 1984 until 1999. He started Brand FX in 2001 and has run the company ever since. Finley testified that the stair-step topper design is not essential to the use or purpose of the work topper and does not affect the work topper's cost or quality. Finley also testified that his competitors primarily sold dome-shaped toppers, and that the dome shape is not functional or essential to the use of the work topper.

The jury also heard testimony regarding the stair-step design's lack of functionality from Sam Alfano, the Cook's employee in charge of purchasing its work toppers and overseeing its truck fleet. Alfano purchased approximately ninety to one hundred toppers per year on behalf of Cook's. He testified that, to his knowledge, the stair-step design is not essential to the use or purpose of the work topper, nor does it affect the topper's cost or quality. Cook's purchased stair-step toppers from Astoria for the same price as Astoria's dome-shaped toppers.

Testimony from three Astoria witnesses—Robert Wolf, Randy Thole, and Jack Brannan—also relates to the stair-step design's lack of functionality. Wolf, Astoria's president and owner, testified that the stair-step design is not essential to a topper, that he preferred the dome-shaped roof design, and that the stair-step design was not good for manufacturing. Wolf stated that the stair-step design was only "essential" to Cook's in order to match its existing fleet:

> Q: Is [the stair-step topper design] essential or not essential?
>
> . . . .
>
> A: It is essential for what Mr. Cook's designed [sic] is.
>
> Q: . . . You didn't tell me that in your deposition. *You said it wasn't essential.*
>
> A: *It's not if you allow me to design the topper. I don't need the stair step.* But if you're going to use that design, it's very essential. [Emphasis added.]

Thole, Astoria's engineer who developed its version of the stair-step topper, also testified that the stair-step design is not essential to the use or purpose of a work topper. Brannan, Astoria's former chief engineer, likewise testified that the stair-step design is not essential to strengthen the roof of a topper because the dome shape gives the roof enough strength for the topper's intended use.

11

Based on our consideration of evidence favorable to the challenged finding if a reasonable factfinder could, and disregarding evidence contrary to the finding unless a reasonable factfinder could not, we hold that there is legally sufficient evidence to support the finding that Brand FX's stair-step topper design is primarily nonfunctional.

Astoria also contends that the evidence is factually insufficient to support the finding of nonfunctionality. As evidence contrary to the finding, Astoria cites the testimony of Finley, Brannan, and Wolf that the molded shape of the design increases the strength of the topper's roof without added materials, or increases the topper's "sectional modulus."[18] Finley testified on "sectional modulus" as follows:

> Q:    Tell us what [sectional modulus] is.
>
> A:    Basically, the higher the sectional modulus, the higher the stiffness . . . of the laminate.
>
> Q:    It gives you a stronger design without having to use additional materials; isn't that correct?
>
> A:    Correct.
>
> Q:    All right. Functionality; isn't that correct?

---

[18] *See, e.g.*, *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996) (holding that a steel deck's corrugated dovetail profile impacts the sectional modulus of the deck, determining how much stress the product will tolerate and ultimately affecting the product's strength).

A: I have been told that the definition of functional is essential, and that the top can be built without the stair-step design and still be functional. Does it serve a function? Yes.

Brannan also testified about the functionality of Brand FX's stair-step design:

Q: [Y]ou don't necessarily need the stair-step design to have the proper strength for the intended use of that, true?

A: If you wanted to minimize the cost and eliminate the need for additional materials, then a stair-step design is really the way to go.

. . . .

Q: Your opinion is that the stair step design is functional in that it increases the strength of the topper, true?

A: That's correct.

The jury also heard evidence from Wolf that the stair-step design allows the topper to carry heavier loads on its roof without added material costs. Photographs and drawings were introduced showing the placement of a load-carrying rack on the roof of the topper.

However, the jury also heard evidence showing that it is not essential for a topper to have added roof strength or the ability to carry heavier loads on the roof: Brand FX's advertisements did not promote the topper's added strength

due to the stair-step design,[19] and some introduced photographs of the topper showing no roof rack and no load on the top. Additionally, Brannan testified that he was asked to look at ways to strengthen the roof design of another of Astoria's products, a flat-topped full utility body cover, and that he did not even consider using a stair-step design to strengthen the roof of that product.

Astoria also challenges evidence of nonfunctionality presented by Brand FX. Astoria contends that Finley provides the sole testimony supporting nonfunctionality and that his testimony is conclusory.[20] However, testimony from Alfano, Thole, Brannan, and Wolf also provides evidence of nonfunctionality. And Finley's testimony was supported by his years of experience as a fiberglass manufacturer and designer and was based on his specific knowledge of the stair-step design and its manufacture beginning in 1996 when he bought the company that had owned the design, Northwest

---

[19] Astoria points to a Brand FX advertisement stating that "[w]ith a BRAND FX topper, you're assured of outstanding strength and durability in a product weighing substantially less than steel or aluminum." But that advertisement promotes the advantages of Brand FX's fiberglass product over metal toppers, not any advantages of the stair-step design over toppers with other roof shapes.

[20] *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (holding that a scientific opinion is conclusory and cannot be considered probative evidence "if no basis for the opinion is offered, or the basis offered provides no support").

Body, and decided to incorporate it into the product line of his own company, Fibre Body.

Astoria also argues that Alfano's testimony of nonfunctionality is conclusory and is not probative because he was a fact witness and an accountant by training. However, Alfano testified based on his first-hand experience as the person who purchases and manages Cook's fleet of toppers and utility bodies, including toppers with stair-step and dome-shaped roofs. Alfano's experience thus involved the use, purpose, cost, and quality of toppers purchased and used by Cook's, all factors relating to the stair-step roof design's functionality.[21]

Considering and weighing all of the evidence in the record pertinent to the finding of nonfunctionality, we determine that the evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[22] Accordingly, we hold that there is factually sufficient evidence to support the jury's finding that Brand FX's stair-step topper design is primarily nonfunctional. We overrule Astoria's first issue.

---

[21] *See TrafFix*, 532 U.S. at 32–33, 121 S. Ct. at 1261–62 (holding that a product is generally functional if it is essential to the use or purpose of the article or affects the cost or quality of the article).

[22] *See Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823.

C. Trade Dress Infringement—Secondary Meaning

To prevail on its trade dress infringement claim, Brand FX also bore the burden at trial of proving that the topper's stair-step design has acquired a secondary meaning.[23] Trade dress acquires secondary meaning when, "in the minds of the public, the primary significance of [the design] is to identify the source of the product rather than the product itself."[24] The existence of secondary meaning is a question for the trier of fact, and a trier of fact's finding on this issue will not be disturbed unless clearly erroneous.[25]

Secondary meaning may be established through a combination of the following nonexhaustive list of evidentiary factors: (1) length and manner of use of the trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the

---

[23] 15 U.S.C.A. § 1125(a); *Samara Bros.*, 529 U.S. at 210, 215, 120 S. Ct. at 1343, 1346.

[24] *Samara Bros.*, 529 U.S. at 211, 215, 120 S. Ct. at 1343, 1346; *see* 15 U.S.C.A. § 1125(a). The jury was instructed without objection that trade dress "acquires 'secondary meaning' if it is uniquely associated with a specific source and identifies the source of the product rather than the product itself."

[25] *Sunbeam Prods. Inc. v. W. Bend Co.*, 123 F.3d 246, 253 (5th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998), *abrogation on other grounds recognized by Eppendorf-Netheler-Hinz GMBH*, 289 F.3d at 356.

defendant's intent in copying the trade dress.[26] The ultimate determination of whether trade dress has acquired secondary meaning remains a question of consumer association.[27]

The jury found that the stair-step topper roof design had acquired secondary meaning. Astoria contends that the evidence is not legally sufficient to support this finding.

In support of secondary meaning, Brand FX introduced evidence regarding length and manner of its use of the stair-step topper design. Brand FX and its predecessors Northwest Body and Fibre Body have continuously used the design since at least the mid-1990s, and had done so exclusively until Astoria copied the design in late 2002. As further support of secondary meaning, Brand FX also introduced evidence of Astoria's intent in copying the design; Thole and Wolf testified that Astoria intentionally copied Brand FX's stair-step design with the intent of having Astoria's design be as close as possible to Brand FX's design. Additionally, Brand FX presented direct testimony from two customers—one end user and one distributor—supporting a finding of secondary meaning because they uniquely identified or associated the stair-step roof

---

[26] ... *Pebble Beach Co.*, 155 F.3d at 541; *Sunbeam Prods*, 123 F.3d at 254.

[27] ... *Sunbeam Prods.*, 123 F.3d at 254.

design with Brand FX. The customers also testified to actual confusion by Astoria's use of the trade dress by incorrectly identifying a picture of Astoria's topper as Brand FX's based on its stair-step roof design. Accordingly, Brand FX introduced evidence supporting three of the factors relevant to consumer association indicative of secondary meaning.[28]

Based on our consideration of evidence favorable to the challenged finding if a reasonable factfinder could, and disregarding evidence contrary to the finding unless a reasonable factfinder could not, we hold that there is legally sufficient evidence to support the finding that Brand FX's stair-step topper design has acquired secondary meaning.

Astoria contends that the evidence is factually insufficient to support the finding of secondary meaning because there is purportedly no evidence regarding other factors that traditionally indicate secondary meaning has been acquired. For instance, consumer-survey evidence of identification of the trade dress with its source is the most direct and persuasive evidence to establish secondary meaning.[29] Here, Brand FX performed no consumer surveys. Moreover, there is no evidence of two other factors traditionally indicative of

---

[28] ... *See id.*

[29] ... *See id.* at 254–55.

secondary meaning:  media coverage and advertising expenditures by Brand FX promoting its stair-step design.[30]

With regard to length and exclusivity of use, Astoria contends that the evidence offered by Brand FX actually contradicts a finding of secondary meaning because Brand FX did not begin selling its stair-step toppers until 2002.  However, evidence of a predecessor's use may establish the length and exclusivity of a plaintiff's use.[31]  Brand FX introduced evidence that Northwest Body developed the stair-step topper design before it was acquired by Fibre Body Industries in approximately 1996, and Brand FX subsequently acquired Fibre Body's intellectual property rights in 2002.  The evidence shows that only Brand FX and the prior owners of the design used it, to the exclusion of all others,  from at least 1996 until Astoria developed its look-alike topper in 2002.  Thus, the length and exclusivity of use by Brand FX and the prior owners of the design support a finding of secondary meaning.

---

[30] … *See Pebble Beach Co.*, 155 F.3d at 541; *Sunbeam Prods.*, 123 F.3d at 254.

[31] … *See, e.g.*, *Zatarain's, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir. 1983) (holding that plaintiff established secondary meaning through predecessor's prior continued use of the mark and other factors), *overruled on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 116, 124, 125 S. Ct. 542, 547, 551 (2004).

Regarding direct customer testimony, Astoria contends that the testimony introduced by Brand FX was insufficient because it came from only two witnesses—one distributor and one end user—and their past association with Brand FX makes their testimony of little weight. However, cases Astoria cites in support of these contentions are distinguishable. For example, Astoria relies on a case in which the direct testimony of seven witnesses was outweighed by evidence of a consumer survey establishing a lack of customer identification,[32] but Astoria introduced at trial no evidence establishing a lack of customer identification. Astoria also cites a case in which six customers' testimony of confusion was insufficient in comparison to the number of potential customers, consisting of all buyers of telephone and network installation services in the Southern California area.[33] Here, the number of customers who testified, two, must be weighed against the number of potential customers, which in this case are businesses that purchase utility bodies and work toppers.[34]

---

[32] *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir. 1979), *cert. denied*, 444 U.S. 1016 (1980).

[33] *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 875 (9th Cir. 2002).

[34] As circumstantial evidence of the relevant number of potential purchasers of utility bodies and work toppers, the trade journal in which Astoria ran its "DARE TO COMPARE" advertising campaign had a monthly circulation of approximately 18,000.

Astoria also contends that its intent in copying the design does not support secondary meaning because it did not intend to fool Cook's as to the topper's source. Astoria argues that it was merely responding to Cook's own request that Astoria offer a look-alike topper. However, Astoria concedes that it developed its stair-step topper with the intent that it look as similar to Brand FX's design as possible. Thus, Astoria intended to confuse those looking at its topper into assuming that it had the same source as the Brand FX toppers in Cook's existing fleet.

Considering and weighing all of the evidence in the record pertinent to the finding of secondary meaning, we determine that the evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[35] Accordingly, we hold that there is factually sufficient evidence to support the jury's finding that Brand FX's stair-step topper design has acquired secondary meaning. We overrule Astoria's second issue.

---

[35] ... *See Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823.

21

## IV. FEDERAL PATENT LAW DOES NOT PREEMPT BRAND FX'S MISAPPROPRIATION CLAIM

In its third issue, Astoria contends that Brand FX's common law design misappropriation claim conflicts with, and is thus preempted by, federal patent law.

A common law misappropriation claim alleges a form of unfair competition under Texas law.[36] "The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters."[37] To prevail on a claim of common law misappropriation, the plaintiff has the burden of establishing: (1) the creation of its product through extensive time, labor, skill and money, (2) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a "free ride") because the defendant is burdened with little or none of the expense incurred by the plaintiff, and (3) commercial damage to the

---

[36] *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App.—Waco 1993, writ denied).

[37] *Id.* at 217. Other unfair competition claims include theft of trade-secrets and "palming off" one's product as that of another. *Id.*

plaintiff.[38]  Here, Brand FX claims that Astoria misappropriated the stair-step roof design of its toppers.

There is a presumption against federal preemption of state actions.[39] However, state laws are preempted if they conflict with valid federal law by creating an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[40] Astoria asserts that Brand FX's misappropriation claim conflicts with Astoria's right, created under federal patent law, to copy and use product features that are in the public domain.[41]

The Supreme Court has held that state regulation of intellectual property "must yield to the extent that it clashes with" federal patent law.[42]  The Court determined that "the efficient operation of the federal patent system depends upon substantially free trade in publicly known, unpatented design and

---

[38] *Id.* at 218.

[39] *Wyeth v. Levine*, 129 S. Ct. 1187, 1194–95 & 1195 n.3 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250 (1996)).

[40] *Id.* at 1193 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941)); *see BIC Pen Corp. v. Carter*, 251 S.W.3d 500, 504 (Tex. 2008).

[41] *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152, 109 S. Ct. 971, 978 (1989).

[42] *Id.* at 152, 109 S. Ct. at 978.

*utilitarian* conceptions."[43] In the same opinion, the Court held that state unfair competition laws, in contrast, generally serve a different purpose by providing "protection against copying of *nonfunctional* aspects of consumer products."[44] Thus, the Court determined that state unfair competition laws typically are not preempted[45] unless they conflict with federal patent law by protecting or regulating the "*functional* aspects" of a product.[46]

Turning to the facts of our case, we already have held that the record contains legally and factually sufficient evidence supporting the jury's finding that Brand FX's stair-step topper design is not functional.[47] This holding is fatal to Astoria's preemption argument, because federal patent law does not preempt

---

[43] *... Id.* at 156, 109 S. Ct. at 980 (emphasis added).

[44] *... Id.* at 158, 109 S. Ct. at 981 (emphasis added).

[45] *... Id.* at 164, 109 S. Ct. at 985 (holding in part that "the law of unfair competition . . . [has] coexisted harmoniously with federal patent protection for almost 200 years, and Congress has given no indication that [its] operation is inconsistent with the operation of the federal patent laws").

[46] *... Id.* at 156, 159, 109 S. Ct. at 980, 982 (emphasis added) (holding Florida statute is preempted because it is "aimed directly at preventing the exploitation of the design and *utilitarian* conceptions embodied in the product itself" and "constrict[s] the spectrum of *useful* public knowledge" (emphasis added)).

[47] *... See* 15 U.S.C.A. § 1125(a); *Samara Bros.*, 529 U.S. at 210, 215, 120 S. Ct. at 1343, 1346.

state unfair competition laws that protect against the copying of product's nonfunctional aspects.[48]  Accordingly, we overrule Astoria's third issue.

## V.  AWARD OF PROFITS ON BRAND FX'S FALSE ADVERTISING CLAIM

In its fourth issue, Astoria contends that the evidence is not legally or factually sufficient to support an award of Astoria's utility body profits on Brand FX's false advertising claim and that the award amounts to an impermissible penalty.[49]  The jury found that Astoria's profits on its sale of utility bodies during the relevant time period was zero.  Brand FX filed a motion for JNOV contending that no evidence supported the jury's zero profits finding and requesting an award of Astoria's utility bodies profits.  After an evidentiary hearing, the trial court granted Brand FX's JNOV motion and awarded it $630,000 as the amount of Astoria's profits related to sales of its advertised utility bodies during the period of time the "DARE TO COMPARE" advertisement ran.[50]

---

[48] *See Bonito Boats*, 489 U.S. at 158, 109 S. Ct. at 981.

[49] On appeal, Astoria does not challenge the jury's finding that it is liable for false advertising or that Brand FX "has been or is likely to be injured" as a result; it only challenges lost profits awarded on the claim.

[50] Alternative to its JNOV motion, Brand FX requested that the trial court disregard the jury's zero lost profits finding.  As the following dated and initialed docket entry states, the court granted JNOV rather than the alternative relief Brand FX requested:  "1/24/08 – P motion JNOV is granted awarded $630,000 FWD [the Honorable Fred W. Davis]."

25

A.    JNOV Standard of Review

A trial court may disregard a jury verdict and render a JNOV if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper.[51]  A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue.[52]

To determine whether the trial court erred by rendering a JNOV, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern legal sufficiency review.[53]  We must credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not.[54]

---

[51] ... *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex. 1991).

[52] ... *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied).

[53] ... *See Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003).

[54] ... *Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *see Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

26

B.    False Advertising Under the Lanham Act and Available Remedies

To establish a prima facie case of liability for false advertising under the Lanham Act, the plaintiff must show that (1) the defendant made a false statement of fact about its product in a commercial advertisement, (2) the statement actually deceived or has a tendency to deceive a substantial segment of its audience, (3) the deception is likely to influence a purchasing decision, (4) the defendant caused the false statement to enter interstate commerce, and (5) the plaintiff has been or is likely to be injured as a result.[55]

Remedies available to a plaintiff on a Lanham Act false advertising claim include the defendant's profits on the falsely advertised product:

> [T]he plaintiff shall be entitled . . . subject to the principles of equity, to *recover . . . defendant's profits* . . . . The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits *the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed*. . . . If the court shall find that the amount of the recovery based on profits is either inadequate or excessive *the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case*. Such sum in either of the above circumstances shall constitute compensation and not a penalty.[56]

---

[55] *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 462 (5th Cir. 2001).

[56] 15 U.S.C.A. § 1117(a) (West 2009) (emphasis added).

These remedies are designed to compensate the plaintiff for any injury suffered, prevent unjust enrichment, or deter unlawful conduct.[57] In determining whether an award of the defendant's profits is appropriate, a trial court is afforded "great latitude" and "wide discretion,"[58] and we review the trial court's decision for an abuse of discretion.[59]

Evidentiary factors relevant to the determination of whether an award of profits is appropriate on a Lanham Act false advertising claim include but are not limited to:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.[60]

---

[57]... *See Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 340 (5th Cir. 2008); *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 889 (Tex. App.—Dallas 2004, no pet.).

[58]... *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1304 (5th Cir. 1997).

[59]... *Pebble Beach Co.*, 155 F.3d at 554.

[60]... *Am. Rice*, 518 F.3d at 338; *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir. 2002), *cert. denied*, 540 U.S. 814 (2003).

No one factor is fatal or controlling.[61]  In any event, an award of profits is not appropriate "unless there is some proof that plaintiff lost sales or profits, or that defendant gained them."[62]

As the Lanham Act provides, "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed" against its gross sales.[63]  The Supreme Court acknowledged that this method of calculating profits may result in the plaintiff receiving a windfall in cases "where it is impossible to isolate the profits" from conduct that violates the Lanham Act, but the Court determined that "the windfall should go to the plaintiff rather than the wrongdoer."[64]  And "Congress did not put upon the despoiled the burden . . . of showing that but for the defendant's unlawful [activity], *particular* customers would have purchased the plaintiff's goods."[65]

---

[61] ... *Quick Techs.*, 313 F.3d at 349.  Brand FX does not contend that this is a case of palming off, but that there is evidence of each of the other factors supporting an award of Astoria's profits.

[62] ... *Logan*, 263 F.3d at 464–65.

[63] ... 15 U.S.C.A. § 1117(a).

[64] ... *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207, 62 S. Ct. 1022, 1025 (1942); *see also Qaddura*, 141 S.W.3d at 889.

[65] ... *Mishawaka*, 316 U.S. at 206, 62 S. Ct. at 1024 (emphasis added).

C.    JNOV Awarding Astoria's Utility Body Profits to Brand FX

Brand FX presented evidence that utility body sales were diverted by Astoria's false advertising.[66]  Specifically, Finley testified for Brand FX that its utility body sales decreased 21% during Astoria's advertising campaign and increased 54% thereafter.  This type of statistical evidence is sufficient to show sales diversion under § 1117 because the statute does not require the plaintiff to show that, "but for the defendant's unlawful [activity], *particular* customers would have purchased the plaintiff's goods."[67]  In addition, Scott Metzger, Astoria's head of sales and marketing, testified that potential customers sought additional information from Astoria in response to its advertising.  Of those potential customers, Astoria and Brand FX competed for sales to Altec and Omaha Public Power District; Altec is now one of Astoria's largest customers; and Astoria replaced Brand FX as the supplier for Omaha Public Power District.[68]

---

[66] *See Logan*, 263 F.3d at 464–65; *Pebble Beach Co.*, 155 F.3d at 555.

[67] *Qaddura*, 141 S.W.3d at 889 (emphasis added).

[68] Astoria argues that this evidence cannot support diversion of sales because it fails to establish that any particular sale was won by Astoria or lost by Brand FX.  However, this evidence is circumstantial evidence of sales diversion, particularly as Brand FX and Astoria comprise approximately ninety percent of the fiberglass utility body and work topper market.  Any ultimate fact may be proved by circumstantial evidence.  *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993).  A fact is established by circumstantial evidence when

30

Regarding Astoria's intent to confuse or deceive, Wolf, Thole, and Metzger each testified that they knew the advertisement contained false statements with respect to Brand FX. Astoria still continued to run the false advertisement for approximately eleven months after Brand FX's attorney sent it a cease and desist letter.

Whether or not other remedies are adequate is also a factor courts consider when determining whether an award of profits is appropriate.[69] In cases of willful misconduct in which the defendant is unjustly enriched, other remedies, such as injunctive relief, have been found inadequate because they will not deter future misconduct.[70] Here, the jury was not asked to find whether Astoria's false advertising was willful,[71] but evidence of Astoria's

the fact may be fairly and reasonably inferred from other facts proved in the case. *Id.*

[69] *See Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 586 (5th Cir. 1980).

[70] *See id*.

[71] The jury was asked if they found "by clear and convincing evidence that the harm to Brand FX resulted from malice," and they were instructed that "malice" means "a specific intent by Astoria to cause substantial injury or harm to Brand FX." The jury answered "No." This answer is not controlling on the issue of willful misconduct because the court's determination of whether an award of lost profits is appropriate on a false advertising claim does not require "clear and convincing evidence," and it considers the defendant's intent to commit the violation, not its intent "to cause substantial injury or harm." *See* 15 U.S.C.A. § 1117(a); *Am. Rice*, 518 F.3d at 338; *Quick Techs.*, 313 F.3d

willful misconduct in the record includes testimony that Astoria knew the advertisement was false as to Brand FX and still chose to continue running it even after receiving Brand FX's cease and desist letter. Based on the willfulness of Astoria's violation, other remedies are not appropriate to compensate Brand FX and to deter future misconduct.[72] In addition, an award of profits serves the public interest in this case by ensuring that willful false advertising violations are not profitable.[73]

The trial court implicitly determined that an equitable award of Astoria's profits was appropriate and determined the amount of the award based on the framework established in 15 U.S.C.A. § 1117(a), which requires the plaintiff "to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed" against sales.[74] Brand FX's damages expert, Daniel Jackson, testified without objection that Astoria had $4.2 million in sales revenue on its utility bodies during the period it committed false advertising. Jackson based his testimony on historical sales figures produced by Astoria during the lawsuit.

---

at 349.

[72] _..._ _See Maltina Corp._, 613 F.2d at 586.

[73] _..._ _See Am. Rice_, 518 F.3d at 338.

[74] _..._ _See_ 15 U.S.C.A. § 1117(a).

32

Although § 1117 provides that the defendant must prove all elements of cost or deduction claimed from its sales revenue,[75] Astoria did not present any evidence of its costs or deductions.  In addition, the manner in which Astoria produced its financial figures did not allow for a determination of its profit margin on the product.  The most analogous information presented to the jury regarding profit margin was Brand FX's 38.5% profit margin on the sales of its toppers.

Based on the evidence, the trial court determined that Astoria obtained $4.2 million in utility body sales revenue during the period it falsely advertised and that Astoria's profit margin was fifteen percent.  Accordingly, the court awarded Brand FX $630,000 in Astoria's profits on the false advertising claim. Implicit in the court's award is its determination that the amount awarded constitutes compensation for Brand FX and not a penalty.[76]  Viewing the evidence in the light most favorable to the jury's finding that Astoria had zero utility body profits during the relevant time period,[77] we hold that the trial court's JNOV awarding Brand FX $630,000 in Astoria's utility body profits is

---

[75] *... See id.*

[76] *... See id.*

[77] *... See Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003).

proper because the evidence is insufficient to raise a material fact issue regarding the costs or deductions to be applied against Astoria's sales.[78]  We overrule Astoria's fourth issue.

## VI.    ADMISSION OF HEARSAY EVIDENCE OF BRAND FX'S CORRECTIVE ADVERTISING COSTS

In its fifth issue, Astoria argues that the trial court erred by admitting Jackson's expert testimony regarding Brand FX's corrective advertising costs because his testimony contained, and was merely a conduit for, hearsay evidence Jackson obtained from advertising executive Tom Prikryl.  Astoria contends that this portion of Jackson's testimony was, therefore, inadmissible and, in the alternative, should only have been admitted with a proper limiting instruction under Texas Rule of Evidence 705.[79]

---

[78] *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77; *Farlow*, 284 S.W.3d at 919.  Brand FX urges us to review the trial court's profits award for abuse of discretion. *See Pebble Beach Co.*, 155 F.3d at 554.  Because the trial court submitted the issue to the jury and granted JNOV, we review its decision under the JNOV standard. *See*, *e.g.*, *Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 697 (5th Cir. 1992) (reviewing under JNOV standard trial court's decision to overturn recovery based on jury's § 1117(a) finding).  Astoria presented no evidence of its costs or deductions as required by § 1117(a) and, thus, we would reach the same result under either the JNOV or the abuse of discretion standard. *See id.*

[79] Although Astoria challenges its admissibility, Astoria does not contest the competence of Jackson's opinion testimony regarding Brand FX's corrective advertising damages as unreliable, irrelevant, or otherwise.  And although we acknowledge Astoria's post submission letter brief enclosing a copy of the slip opinion in *City of San Antonio v. Pollock*, 284 S.W.3d 809 (Tex. 2009), in

34

A.     Standard of Review

A trial court's rulings in admitting evidence are reviewable under an abuse of discretion standard.[80]  An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling.[81] To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.[82]  An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances.[83]

---

which the supreme court reaffirms that "bare baseless opinions will not support a judgment even if there is no objection to their admission in evidence," Astoria does not assert that Jackson's opinion regarding corrective advertising costs is baseless or conclusory.

[80]... *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527–28 (Tex. 2000) (op. on reh'g).

[81]... *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

[82]... *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

[83]... *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court.[84] The complaining party must usually show that the whole case turned on the evidence at issue.[85] If erroneously admitted evidence was crucial to a key issue, the error was likely harmful.[86] We examine the entire record in making this determination of harm.[87] Error in admitting evidence is generally harmless if the objecting party "open[s] the door" by introducing the same or similar evidence,[88] the objecting party later permits the same or similar evidence to be introduced without objection,[89] or

---

[84] Tex. R. App. P. 44.1(a); *see Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005).

[85] *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995).

[86] *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *Reliance Steel*, 267 S.W.3d at 873.

[87] *Interstate Northborough P'ship*, 66 S.W.3d at 220.

[88] *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *Sw. Elec. Power Co. v. Burlington N. R.R.*, 966 S.W.2d 467, 473 (Tex. 1998).

[89] *Bay Area Healthcare Group*, 239 S.W.3d at 235; *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984).

36

the contested evidence is merely cumulative of properly admitted evidence and is not controlling on a material issue dispositive of the case.[90]

B.    Error Admitting the Contested Hearsay Evidence, if Any, is Harmless

Outside the presence of the jury and before Jackson testified at trial, Astoria objected to the admission of "any evidence obtained from Tom Prikryl" as being "third-party hearsay" and to Brand FX using Jackson as a "conduit for hearsay."  Alternatively, Astoria sought a limiting instruction under rule 705 of the Texas Rules of Evidence that the jury "be instructed not to accept the information obtained from [Prikryl] for the truth of the matter asserted."[91]  The

---

[90] ... *Interstate Northborough P'ship*, 66 S.W.3d at 220; *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989).

[91] ... Admission of otherwise inadmissible facts or data underlying an expert's opinion is governed by Texas Rule of Evidence 705, which provides in relevant part:

(a) Disclosure of Facts or Data.  The expert may testify in terms of opinion or inference and give the expert's reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise.  *The expert may in any event disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data.*
. . . .
(d) Balancing test; limiting instructions.  When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial.  *If otherwise inadmissible facts or data are disclosed before the jury, a limiting instruction by the court shall be*

37

court overruled the objections and denied Astoria's motion for a limiting instruction.  Astoria did not object at trial and does not argue on appeal that Jackson cannot rely on facts not otherwise admissible in evidence, including hearsay evidenced from an advertising executive regarding corrective advertising costs.[92]

Jackson testified that his opinion regarding Brand FX's corrective advertising costs was based on information provided to him by Prikryl:

Q: Did you summarize your damages as it relates to this "Dare to Compare" advertisement?

A: Yes, I did.

Q: And what are the summary damages that you calculated?

A: . . . If you look at the corrective advertising based upon Mr. Prykel's [sic] information and what he believed would be necessary to accomplish it, it's $76,200.

---

*given upon request.*

Tex. R. Evid. 705(a), (d) (emphasis added).

[92] ... In its briefing before the court, Astoria states that "[n]o one can dispute that Tex[as] R[ule of] Evid[ence] 703 allows an expert to rely on facts not otherwise admissible in evidence" and that "experts are typically allowed to disclose otherwise inadmissible hearsay for the limited purpose of explaining the basis of their opinions" even though such hearsay is not admissible for its truth [citation omitted]."

38

Jackson also testified that it was "reasonable and customary" in his profession as a certified public accountant to rely on an advertising expert to determine the proper cost of corrective advertising.

Whether or not the trial court erred in admitting Jackson's testimony about information provided by Prikryl, such testimony is cumulative of other testimony that was admitted without objection. Separately and without reference to Prikryl, Astoria's counsel solicited the following testimony from Jackson:

> Q: *[Y]ou're the one* telling [the jury] to award $76,000 for future corrective advertising on something that hadn't run since four years ago and had no impact on the two people who came here [to testify]?
>
> A: If they determine Astoria did falsely advertise. If they determine [Astoria] didn't falsely advertise, I'd say don't award [Brand FX] a penny. [Emphasis added.]

This testimony establishes Jackson's opinion regarding Brand FX's corrective advertising costs, does not reference information provided by Prikryl, and was admitted without objection. Any error by the trial court in admitting the contested testimony is harmless because Astoria later permitted similar evidence to be introduced without objection during its cross-examination of Jackson and the contested evidence is merely cumulative of properly admitted evidence on Jackson's opinion regarding Brand FX's corrective advertising

39

costs.[93]  Accordingly, we hold that the trial court's error in admitting the contested heresay testimony, if any, did not probably cause the rendition of an improper judgment.[94]  We overrule Astoria's fifth issue.

## VII.  ATTORNEY'S FEES

In its sixth and final issue, Astoria contends that the trial court erred by awarding attorney's fees on Brand FX's trade dress infringement and false advertising claims because this is not an "exceptional case" in which an award of fees is authorized by the Lanham Act and, alternatively, because appellate fees were not properly conditioned on a successful appeal.

The Lanham Act provides that "the court in exceptional cases may award reasonable attorney fees to the prevailing party."[95]  The prevailing party has the burden to demonstrate the exceptional nature of the case by clear and convincing evidence.[96]  Clear and convincing evidence is that measure or degree

---

[93] *... See Bay Area Healthcare Group*, 239 S.W.3d at 235; *Interstate Northborough P'ship*, 66 S.W.3d at 220; *Gee*, 765 S.W.2d at 396; *Richardson*, 677 S.W.2d at 501.

[94] *... See* Tex. R. App. P. 44.1(a)(1); *Interstate Northborough P'ship*, 66 S.W.3d at 220.

[95] *...* 15 U.S.C.A. § 1117(a).

[96] *... Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1390 (5th Cir. 1996) (citing *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 65 (5th Cir. 1992)).

of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.[97]

Exceptional cases include when the defendant's violation of the Lanham Act is malicious, fraudulent, deliberate, or willful.[98] The trial court should decide whether a case is exceptional "by examining all the facts and circumstances."[99] "The determination as to whether a case is exceptional is left to the sound discretion of the trial court."[100] We review a decision to award attorney's fees for an abuse of discretion and the trial court's finding as to whether the case is exceptional for clear error.[101]

Regarding Astoria's trade dress infringement, the evidence establishes that Astoria knew that Brand FX owned the rights to the unique stair-step design and that Cook's warned Astoria not to violate Brand FX's rights. Astoria proceeded to copy Brand FX's design anyway, using Brand FX's drawings and one of its toppers as a "plug" to produce a stair-step topper mold. Thole, the

---

[97] Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (Vernon 2008); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994).

[98] *Seven-Up Co.*, 86 F.3d at 1390.

[99] *CJC Holdings*, 979 F.2d at 65.

[100] *Seven-Up Co.*, 86 F.3d at 1390.

[101] *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distribution Co.*, 520 F.3d 393, 402 (5th Cir. 2008).

Astoria engineer in charge of the project, stated at the time that he knew that Astoria's actions were "improper" and "wrongful."

Regarding Astoria's false advertising, three Astoria witnesses conceded that the "DARE TO COMPARE" advertisement contained statements that were false with respect to Brand FX. Astoria nonetheless ran the advertisement, and continued to run it for eleven months after receiving Brand FX's cease and desist letter.

Based on the record in this case, we hold that the trial court could find by clear and convincing evidence that Astoria deliberately and willfully committed trade dress infringement and false advertising. The trial court's finding that this is an exceptional case is not clearly erroneous, and its decision to award attorney's fees is not an abuse of discretion.[102]

A trial court may not, however, grant a party an unconditional award of appellate attorney's fees, because to do so could penalize the other party for pursuing a meritorious appeal.[103] We therefore hold that the trial court erred by

---

[102] *See, e.g. Schlotzsky's, Ltd.*, 520 F.3d at 402 (affirming award of attorney's fees based on defendant's bad faith misrepresentations in violation of Lanham Act); *Taco Cabana Int'l*, 932 F.2d at 1127–28 (affirming award of attorney's fees based on defendant's "brazen imitation" of direct competitor's trade dress).

[103] *Weynand v. Weynand*, 990 S.W.2d 843, 847 (Tex. App.—Dallas 1999, pet. denied).

failing to condition the award of appellate fees on a successful appeal.[104]

Accordingly, we modify the judgment to reflect that Brand FX is only eligible to receive attorney's fees upon successful appeal, and we affirm the award of attorney's fees as modified.[105]

## VIII.    CONCLUSION

We modify the trial court's judgment to reflect that Brand FX is only eligible to receive appellate attorney's fees if successful on appeal, and we affirm the judgment as modified.

BOB MCCOY
JUSTICE

PANEL:  LIVINGSTON and MCCOY, JJ.

DELIVERED: April 8, 2010

---

[104]... *See J.C. Penney Life Ins. Co. v. Heinrich*, 32 S.W.3d 280, 290 (Tex. App.—San Antonio 2000, pet. denied).

[105]... *See* Tex. R. App. P. 43.2(b) (providing appellate court may modify judgment and affirm as modified); *see also Tully v. Citibank (South Dakota), N.A.*, 173 S.W.3d 212, 219 (Tex. App.—Texarkana 2005, no pet.) (modifying judgment to condition attorney's fees on successful appeal); *Heinrich*, 32 S.W.3d at 290 (same).